# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JEFFREY VINCE, Derivatively on Behalf of Nominal Defendant BIOVENTUS INC., <br><br> Plaintiff, <br><br> v. <br><br> KENNETH M. REALI, MARK L. SINGLETON, GREGORY O. ANGLUM, SUSAN M. STALNECKER, WILLIAM A. HAWKINS III, JOHN A. BARTHOLDSON, PATRICK J. BEYER, PHILLIP G. COWDY, MARY KAY LADONE, MICHELLE MCMURRY-HEATH, GUIDO J. NEELS, GUY P. NOHRA, DAVID J. PARKER, MARTIN P. SUTTER, and STAVROS G. VIZIRGIANAKIS, <br><br> Defendants, <br><br> and <br><br> BIOVENTUS INC., <br><br> Nominal Defendant. | Case No.: <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

Plaintiff Jeffrey Vince ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Bioventus Inc. ("Bioventus" or the "Company"), brings this Verified Shareholder Derivative Complaint against Kenneth M. Reali ("Reali"), Mark L. Singleton ("Singleton"), Gregory O. Anglum ("Anglum"), Susan M. Stalnecker ("Stalnecker"), William A. Hawkins III ("Hawkins"), John A. Bartholdson ("Bartholdson"), Patrick J. Beyer ("Beyer"), Phillip G. Cowdy ("Cowdy"), Mary Kay Ladone ("Ladone"), Michelle McMurry-Heath ("McMurry-Heath"), Guido J. Neels ("Neels"), Guy P. Nohra ("Nohra"), David J. Parker ("Parker"), Martin P. Sutter ("Sutter"), and Stavros G. Vizirgianakis ("Vizirgianakis") (collectively, the "Individual Defendants" and, together, with Bioventus, "Defendants") for and among other things, breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*: the investigation conducted by Plaintiff's counsel, including review of publicly available information regarding the Company as well as review of documents Defendants provided pursuant to Plaintiff's request for books and records pursuant to 8 *Del. C.* § 220 ("Section 220"); the allegations of the amended consolidated class action complaint filed in the securities class action, captioned *Ciarciello v. Bioventus Inc., et al.,* Case No. 1:23-cv-00032-CCE-JEP (M.D.N.C. Jan. 12, 2023) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases Bioventus disseminated; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain officers and members of Bioventus's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between February 11, 2021, and March 30, 2023 inclusive (the "Relevant Period").

2.      Bioventus is a medical device Company incorporated in Delaware and based in Durham, North Carolina, specializing in injectable therapies for musculoskeletal healing and regeneration.

3.      Bioventus generates revenue in three different business segments, referred to as "verticals": Pain Treatments, which include hyaluronic acid ("HA") injections used to treat knee pain caused by osteoarthritis; Surgical Solutions; and Restorative Therapies. The Pain Treatments vertical accounts for the vast majority of the Company's sales. Indeed, sales of HA injections alone accounted for 49%, 54% and 53% of the Company's total revenues in 2018, 2019, and 2020, respectively.

4.      Bioventus offers three HA injection products: (i) Supartz FX ("Supartz"), a therapy introduced in 2001 consisting of five injections; (ii) Gelsyn-3 ("Gelsyn"), a therapy introduced in 2016 consisting of three injections; and (iii) Durolane, a single-injection therapy introduced in 2018.

5.      Medical device manufacturers like Bioventus often enter into agreements with third parties such as hospitals or insurance companies, offering those third parties a financial incentive, or rebate, if the third party, for example an insurance company, includes the manufacturer's products on its list of covered products.

3

6. Rebates complicate the reporting of revenues for companies like Bioventus. For instance, if Bioventus were to sell an HA injection to a patient for $100.00, the patient's insurance company might subsequently request a $25.00 rebate from Bioventus. Bioventus would therefore only earn $75.00 in revenue from the sale of this injection.

7. Throughout the Relevant Period, the Company failed to establish or implement any formal procedure for tracking rebates and verifying rebate claims. As a result, according to at least one former employee, the Company would "blindly" pay rebate claims that it received from insurance companies without having any means of independently confirming the amount owed.

8. The Individual Defendants were put on notice of the material deficiencies in Bioventus's internal controls after the Company conducted an internal audit, resulting in a "Red Report," that highlighted twelve action items that needed to be promptly addressed in order to remedy the deficiencies.

9. Rather than take the necessary steps to remedy the deficiencies in the Company's internal controls, however, the Individual Defendants caused Bioventus to enter into a series of major acquisitions, putting significant financial strain on the Company.

10. Making matters worse, in 2021, Congress moved to enact federal regulations regarding Medicare drug pricing that would significantly reduce the prices that Bioventus could charge for Durolane and Gelsyn, its two main HA injection products.

11. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse

facts necessary to make the statements not misleading because they failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (ii) the Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal procedure for tracking rebates and verifying rebate claims; (iii) as a result, the Company's revenues were materially overstated; (iv) Congress had enacted a new law that was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

12.  In light of the Individual Defendants' misconduct, the Company and Defendants Reali, Singleton, Anglum, and Stalnecker are defendants in the Securities Class Action. The Securities Class Action has further subjected Bioventus to the need to undertake internal investigations and the need to implement adequate internal controls, exposing the Company to significant costs and liability. On July 15, 2024, plaintiffs in the Securities Class Action filed a motion for preliminary approval of a $15,250,000 settlement to resolve the claims asserted in the Securities Class Action. This settlement has not yet been approved by the Court.

## JURISDICTION AND VENUE

13.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §78n(a), and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a

5

federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Bioventus's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

17. Plaintiff is, and has been at all relevant times, a shareholder of Bioventus.

18. Nominal Defendant Bioventus is incorporated under the laws of the State of Delaware and its principal executive offices are located at 4721 Emperor Boulevard, Suite 100, Durham, North Carolina 27703. Bioventus's common stock trades on the NASDAQ under the ticker symbol "BVS."

19. Defendant Reali served as Bioventus's Chief Executive Officer ("CEO") and as a member of its Board from April 2020 and September 2020, respectively, until his termination and resignation effective April 4, 2023. According to the proxy statement filed on schedule 14A with the SEC on April 27, 2023 (the "2023 Proxy Statement"), Defendant Reali received $12,618,883 and $4,395,235 in 2021 and 2022, respectively, in

6

compensation from the Company. As of April 12, 2023, Defendant Reali beneficially owned 1,707,724 shares of Bioventus Class A common stock, worth $1,861,419 and constituting 2.1% of the Company's total voting power.[1] Defendant Reali was named as a defendant in the Securities Class Action.

20. Defendant Stalnecker has served as a member of the Board since September 2020 and serves as Chair of the Audit and Risk Committee and as a member of the Compliance, Ethics, and Culture Committee. According to the 2023 Proxy Statement, Defendant Stalnecker received $151,996 in 2022 in compensation from the Company. Defendant Stalnecker was named as a defendant in the Securities Class Action.

21. Defendant Hawkins has served as Chairperson of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Hawkins received $316,991 in 2022 in compensation from the Company. As of April 12, 2023, Defendant Hawkins beneficially owned 112,958 shares of Bioventus Class A common stock, worth $123,124.

22. Defendant Bartholdson has served as a member of the Board since January 8, 2023. Bartholdson serves as a member of the Compliance, Ethics, and Culture Committee and as Chair of the Compensation Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 26, 2024, in 2023, Defendant Bartholdson received $211,704 in total compensation from the Company.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $1.09 per share closing price of Bioventus's stock on April 12, 2023, the record date for the 2023 Proxy Statement.

23. Defendant Beyer has served as a member of the Board since October 2021 and serves as a member of the Audit and Risk Committee. According to the 2023 Proxy Statement, Defendant Beyer received $216,996 in 2022 in total compensation from the Company. As of April 12, 2023, Defendant Beyer beneficially owned 52,519 shares of Bioventus Class A common stock, worth $57,245.

24. Defendant Cowdy has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee. Defendant Cowdy is an employee of Smith & Nephew plc, a medical equipment manufacturing company that beneficially owns 6,229,991 shares of Bioventus's Class A common stock, constituting 28.1% of the Company's total voting power. Since joining Smith & Nephew plc in June 2008, Defendant Cowdy has held various roles of increasing responsibility, and he currently serves as the Chief Business Development and Corporate Affairs Officer. For this reason, Defendant Cowdy does not receive compensation for his service on the Board of Bioventus.

25. Defendant Ladone has served as a member of the Board since July 2021 and serves as a member of the Audit and Risk Committee and the Compensation Committee. According to the 2023 Proxy Statement, Defendant Ladone received $224,496 in 2022 in compensation from the Company.

26. Defendant McMurry-Heath has served as a member of the Board since January 2022 and serves as Chair of the Compliance, Ethics, and Culture Committee. According to the Company's public filings, Defendant McMurry-Heath received $228,361 in 2022 in compensation from the Company.

8

27.     Defendant Neels has served as a member of the Board since September 2020 and serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Neels received $214,496 in 2022 in compensation from the Company. Since 2013, Defendant Neels has served as Operating Partner of EW Healthcare, a healthcare venture capital firm founded by Defendant Sutter that beneficially owns 16.6% of the Company's total voting power.

28.     Defendant Nohra has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Nohra received $226,996 in 2022 in compensation from the Company.

29.     Defendant Parker served as a member of the Board from September 2020 until December 2021. According to the Company's proxy statement filed April 29, 2022 ("2022 Proxy Statement"), Defendant Parker received $214,006 in 2021 in compensation from the Company.

30.     Defendant Sutter has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's 2023 Proxy Statement, Defendant Sutter received $216,996 in 2022 in compensation from the Company. As of April 12, 2023, Defendant Sutter beneficially owned 13,049,672 shares of Class A common stock, worth $14,224,142 and constituting 16.7% of the Company's total voting power. Defendant Sutter further founded EW Healthcare, a healthcare venture capital firm that beneficially owns 16.6% of the Company's total voting power and where Defendant Neels has served as its Operating

9

Partner since 2013.

31.     Defendant Vizirgianakis served as a member of the Board from October 2021 until August 2022. According to the Company's 2023 Proxy Statement, Defendant Vizirgianakis received $188,762 in 2022 in compensation from the Company.

32.     Defendant Singleton has served as Bioventus's Senior Vice President and Chief Financial Officer ("CFO") since March 2022. According to the Company's 2023 Proxy Statement, Defendant Singleton received $2,462,452 in 2022 in compensation from the Company. As of April 12, 2023, Defendant Singleton beneficially owned 68,381 shares of Bioventus Class A common stock, worth $74,535. Defendant Singleton was named as a defendant in the Securities Class Action.

33.     Defendant Anglum served as Bioventus's Senior Vice President and CFO from August 2017 until March 2022. According to the Company's 2022 Proxy Statement, Defendant Anglum received $3,718,800 in 2021 in compensation from the Company. Defendant Anglum was named as a defendant in the Securities Class Action.

### *Non-Party Robert Claypoole*

34.     Non-Party Robert Claypoole ("Claypoole") has served as a Company director and as the Company's President and CEO since January 2024. According to the Employment Agreement between Claypoole and Bioventus, dated December 19, 2023, Claypoole receives a base salary of $800,000 from the Company, and was paid a signing bonus of $750,000 upon commencing his role with the Company. Claypoole is named herein solely for the purposes of demand futility.

### *Non-Party Confidential Witnesses*

10

35.     This action is based on Plaintiff's review, by counsel, of an extensive record of public and non-public documents, including the internal Section 220 documents, as well as the Second Amended Complaint - Class Action (the "SAC") filed on July 31, 2023 in the Securities Class Action, which contains detailed allegations based on interviews with six former Bioventus employees (referred to herein as FEs 1-6) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the SAC with sufficient detail to establish their reliability and personal knowledge.

36.     FE 1 worked at Bioventus between November 2018 and January 2023 as a National Account Director of Market Access. In this role, FE 1 was responsible for negotiating contracts between Bioventus and insurance companies.

37.     FE 2 worked at Bioventus between October 2021 and June 2022 as a Financial Planning and Analysis Manager. Prior to that, FE 2 worked at Misonix, Inc. ("Misonix") from January 2021 until it was acquired by Bioventus in October 2021.

38.     FE 3 worked at Bioventus between April 2021 and January 2022 as an Internal Audit Manager. In that role, FE 3 reported directly to Jessica Dill Gidney ("Gidney"), Bioventus's Director of Internal Audit and Risk Management, who in turn reported to the Audit and Risk Committee of the Board.

39.     FE 4 worked at Bioventus between August 2020 and January 2022 as a Senior Manager of SOX & Internal Audit. In this role, FE 4 reported directly to Gidney.

40.     FE 5 worked at Bioventus as an Accounts Payable Specialist from February 2018 until January 2020 and as a Senior Accounts Payable Specialist from January 2020

11

until November 2021. During his time at Bioventus, FE 5 received and processed requests for payment, including rebate claims from insurance companies.

41.     FE 6 worked at Bioventus between August 2021 and August 2022 as a Payment Specialist.

## SUBSTANTIVE ALLEGATIONS

### Background

42.     Bioventus is a medical device Company specializing in injectable therapies for musculoskeletal healing and regeneration.

43.     On February 11, 2021, Bioventus went public via an initial public offering ("IPO"), issuing 9.2 million shares of Class A common stock at a price of $13.00 per share, generating proceeds of $119.6 million.

44.     Bioventus earns revenue in three different business segments, referred to as "verticals": Pain Treatments, which include HA injections used to treat knee pain caused by osteoarthritis; Surgical Solutions; and Restorative Therapies. The Pain Treatments vertical accounts for the vast majority of Bioventus's sales. Indeed, sales of HA injections alone accounted for 49%, 54% and 53% of the Company's total revenues in 2018, 2019, and 2020, respectively.

45.     Bioventus offers three HA injection products: (i) Supartz, a therapy introduced in 2001 consisting of five injections.; (ii) Gelsyn, a therapy introduced in 2016 consisting of three injections; and (iii) Durolane, a single-injection therapy introduced in 2018.

46.     Given Bioventus's reliance on its Pain Treatment vertical and its sales of HA

12

injections in particular, the Company's revenue generated from these sales was a key indicator of the Company's overall growth and performance.

***Bioventus Failed to Accurately Report Revenue due to Materially Deficient Internal Controls***

47.     Medical device manufacturers like Bioventus often enter into agreements with third parties such as hospitals or insurance companies to offer those third parties a financial incentive, or rebate. This happens, for instance, if the third party is an insurance company and includes the manufacturer's products on its list of covered products.

48.     Rebates can make it more complicated for companies to accurately report its revenues. For instance, if Bioventus sells an HA injection to a patient for $100.00, the patient's insurance company may request a $25.00 rebate from Bioventus And therefore Bioventus would only earn $75.00 in revenue from this injection.

49.     Generally Accepted Accounting Principles ("GAAP") requires that Bioventus deduct expected rebates in its recognition of revenues. In the hypothetical example above, GAAP would mandate Bioventus only report $75.00 in revenue from the sale, rather than $100.00.

50.     Further, pursuant to Accounting Standards Codification ("ASC"), GAAP requires that Bioventus only recognize the amount of revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."[2] To the extent that there is uncertainty regarding the likelihood of a

---

[2] A "reversal" in the amount of revenue refers to a reduction of revenue already recognized in a public financial statement.

reversal, GAAP requires companies to deduct rebates from the revenues they report. During the Relevant Period, Bioventus violated these express GAAP requirements by failing to account for rebates in its reporting of revenues and adjusted EBITDA, causing the Company's reported revenues to be materially overstated and ultimately resulting in a significant reversal.

51.     GAAP refers to rebates as "variable consideration" and, pursuant to ASC 606, companies are required to "estimate the amount of variable consideration." GAAP provides two methods for calculating variable consideration: the "expected value" and the "most likely amount." ASC 606 further requires that companies "consider all the information (historical, current, and forecast) that is reasonably available to [the Company] and identify a reasonable number of possible consideration amounts."

52.     During the Relevant Period, Bioventus purported to calculate variable consideration using the expected value method, which involves taking "the sum of probability- weighted amounts in a range of possible consideration amounts." For example, if there is a 75% chance that a company's variable consideration for a given fiscal period will equal $100 and a 25% chance that a company's variable consideration for that fiscal period will equal $40, then, pursuant to the expected value method, that company should deduct $85.00 from its revenues for that period.

53.     Further, Bioventus was required to "consider all the information (historical, current, and forecast) that is reasonably available" in calculating variable consideration. This included a consideration of Bioventus's customer contracts, which included a total amount of rebates allowed per year. Further, pursuant to the Company's customer contracts,

14

insurers had a year to submit their rebate requests. Therefore, future rebate requests were readily determinable based on the information reasonably available to the Company. For example, if an insurer consistently requested $1,500 in rebates each quarter but only requested $1,250 for one quarter, the Company should expect an additional $250 in rebates to be requested within the following year.

54.     In its public filings, Bioventus repeatedly claimed that it calculated variable consideration using "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." In reality, the Company failed to implement any procedures at all to monitor revenue or rebates from the insurance companies with which Bioventus conducted business.

55.     FE 2 worked at Misonix from January 2021 until it was acquired by Bioventus in October 2021. He then worked at Bioventus as a Financial Planning and Analysis Manger until June 2022. According to FE 2, Bioventus failed to use even basic accounting technology. FE 2 recalled Bioventus employees spending weeks on tasks that should have been automated and that would ordinarily take just minutes to complete at other companies, referring to the process as "insane."

56.     FE 6, a Payment Specialist at Bioventus from August 2021 until August 2022, similarly recalled that employees "didn't even know which bills had been paid or not paid" and "were blinding paying for stuff" because the Company had "no supporting documents" for bills.

57.     FE 5, who worked at Bioventus as an Accounts Payable Specialist, described

15

the Company's process for monitoring rebates as a "real mess" and recalled struggling to navigate Excel spreadsheets with thousands of lines. According to FE 5, the Company had "big problems with the whole rebate calculation" and "[t]hey were always off." FE 5 further confirmed that Bioventus's senior leadership, including Defendants Reali, Anglum, and Singleton, regularly discussed the Company's inability to calculate and track rebates. FE 2 similarly stated that the rebate issue was frequently discussed at monthly Financial Close Meetings attended by Defendants Anglum and Singleton.

### Internal Audit Puts the Individual Defendants on Notice of the Company's Deficient Internal Controls

58.    FE 4 worked for Bioventus from August 2020 until January 2022 as Senior Manager of SOX & Internal Audit. According to FE 4, after receiving a multi-million dollar rebate claim from United Healthcare in May or June of 2021, the Company launched an audit of Bioventus's entire rebate process, reviewing the previous 12 months of rebates and testing the Company's controls over its rebate process, including Sarbanes-Oxley Act of 2002 ("SOX") controls. FE 4 stated that the internal audit was conducted by FE 3, Bioventus's Internal Audit Manager, with the assistance of Gidney, Bioventus's Director of Internal Audit and Risk Management.

59.    The internal audit resulted in a "Red Report." According to FE 4, the "red" designation indicated that there were serious issues with the Company's processes and controls that needed to be rectified immediately, whereas "yellow" would have indicated that there were some issues present, and "green" would have indicated that all of the Company's processes and controls were effective. The Red Report highlighted twelve

16

urgent action items that needed to be promptly addressed by the Company and found that Bioventus's SOX controls and controls regarding rebates, rebate payments, and rebate accruals were ineffective.

60.     According to FE 3, Bioventus established rebate "accrual" rates for each insurance company with which it conducted business. These rates represented estimates of the rebate amount for a given insurance company as a percentage of the revenue generated from that insurance company. For instance, a 10% accrual rate for a given insurer indicated that the Company estimated that it would owe that insurer $10.00 in rebates for every $100.00 made in sales. The Red Report found that the Company had never even created, let alone implemented, any process for accurately calculating rebate accruals.

61.     FE 3 stated that Bioventus would change the accrual rates quarterly without justification. During the internal audit that resulted in the Red Report, FE 3 recalled asking the rebate department "why are you using five percent versus 10 percent?" FE 3 was given no reasoning and was just told that "they didn't know." FE 3 recalled specifically telling the rebate team that "you can't arbitrarily pick a number" as an accrual for a given insurer.

62.     FE 4 similarly recalled the Company "blindly" paying the rebate claims received from insurance companies without having any means of independently confirming the amount owed.

63.     FE 3 confirmed that the Company's senior leadership was made aware of the Red Report. In fact, FE 3 recalled participating in a meeting with Defendant Anglum and other senior leadership in which the results of the internal audit were discussed before the Red Report was even issued. FE 3 stated that, with respect to senior leadership, "[t]hey

17

knew [the Company's method of calculating rebate accruals] was broken." Subsequently, in August 2021, FE 3 sent the Red Report directly to Defendants Reali, Anglum, Stalnecker, and FE 4. FE 3 and FE 4 both confirmed that the Red Report was then given to the Audit and Risk Committee, of which Defendants Beyer Stalnecker, and Ladone were members, and discussed by the Audit and Risk Committee during a quarterly Board meeting.

64.     Despite knowledge of the Red Report and its findings, the Individual Defendants did nothing to address the Company's deficient internal controls. FE 4 characterized the Company at the time as a "shitshow," stating that the Individual Defendants were prioritizing acquiring other companies rather than hiring the needed personnel to implement the changes mandated by the Red Report.

65.     To that end, non-public, internal documents provided by the Company in response to Plaintiff's Section 220 books and records demand confirm that, in contrast to the Company's public statements from the same period, and in addition to the shortcomings the Red Report spotlighted, the Individual Defendants were acutely aware that the Company lacked adequate internal controls.

66.     █████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████  ████  ████████  ██████  ████  ██████  ████  ████  ███████  ██████████

18



67.

68.

---

[3] Citations to "BIOVENTUS_220_#######" are to documents produced by Bioventus in response to Plaintiff's Section 220 demand. The document names contain Bates numbers, but the individual pages are not Bates numbered. Accordingly, citations to Bates numbers refer to documents, not specific pages where the quoted information appears.

19

██████████████████████████████████████████

69.     Therefore, despite being informed by the Red Report in 2021 that Bioventus lacked sufficient internal controls over rebate accrual reporting, the Individual Defendants evidently failed to correct those deficiencies, resulting in a second rebate invoice error that, as detailed below, caused significant damage to the Company.

70.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

71.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

***Excessive Acquisitions put Financial Strain on the Company***

72.     Instead of using the Company's limited resources to address the severe deficiencies in Bioventus's internal controls, the Individual Defendants entered into a series of major acquisitions.

73.     Shortly after receiving funds from the IPO, the Individual Defendants caused the Company to enter into three massive and imprudent acquisitions, putting

Bioventus in debt in excess of $360 million. In March 2021, the Company acquired Bioness, a healthcare company focused on rehabilitation therapies, for $48.8 million in cash. The Bioness agreement required the Company to pay Bioness an additional $50 million in cash by 2025 if certain conditions were met. In October 2021, Bioventus acquired Misonix, a healthcare company focused on ultrasonic technology and regenerative medicine, for $525.3 million, of which $182,988,467 was in cash.

74.     Then, in April 2022, Bioventus completed the acquisition of CartiHeal, a healthcare company focused on the development of knee implants, for $314.9 million. An additional $135 million was made payable by Bioventus contingent upon the achievement of certain sales milestones.

75.     These excessive acquisitions, at a time when the Company was struggling internally, put immense financial strain on Bioventus.

76.     In addition, the successive integrations of the acquisitions further hampered the Company's ability to fix its accounting and control issues. █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

77.     ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

21

78. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ ██ ██████ ██████ █ █████ █████ ████████

████████████████

79.     Further, the need to finance these acquisitions incentivized the Individual Defendants to issue false and misleading statements regarding Bioventus in order to maintain the artificially inflated price of the Company's stock.

*New Federal Medicare Regulations Reduce the Company's Margins and Profitability for two of its Best-Selling Products*

80.     By January 2022, Bioventus had still failed to implement the changes mandated by the Red Report. Meanwhile, the Company was in significant debt as a result of the acquisitions that it made throughout 2021 and still had its eye on the CartiHeal acquisition. Due to the Company's high debt position, the Individual Defendants were incentivized to misleadingly assure the investing public that Bioventus would be able to cover its obligations for past and future acquisitions with the revenue it would generate from sales of its HA injections.

81.     To this end, on March 10, 2022, the Company released financial guidance that forecasted significant growth from sales of HA injections. Specifically, the Company forecasted 2022 revenues of $545 million to $565 million, representing growth of 26% to 31% year-over- year. During an earnings call the same day, Defendant Reali highlighted

22

Bioventus's "HA business where we continue to gain market share with Durolane, our single injection, and Gelsyn, [] our 3 injection, and we see that continuing. The HA market is very strong."

82.     In reality, the Company's revenues were stagnating due in part to newly enacted federal regulations regarding Medicare drug pricing which reduced prices for two of the Company's main HA products, Durolane and Gelsyn.

83.     The Company's contracts for HA products used one of two types of pricing for reporting purposes: Wholesale Acquisition Cost ("WAC"), that does reflect rebates and discounts, and Average Sales Price ("ASP"), that does not reflect rebates and discounts. Historically, Bioventus exploited a regulatory loophole that allowed it to report only WAC prices on Durolane and Gelsyn to the federal government's Center for Medicare and Medicaid Services ("CMS"). This caused Medicare and Medicaid to pay higher reimbursement prices for these products.

84.     Congress addressed the loophole in its Consolidated Appropriations Act, 2021, with a new law that required drug manufacturers like Bioventus to report ASP pricing information to the CMS each quarter, beginning in January 2022. This would cause Medicaid to pay less for Durolane and Gelsyn in 2022 than it had in the past.

85.     The disparity between the Company's WAC and ASP pricing for Durolane and Gelsyn was large. For example, in the first quarter after the products were added to the CMS price list, Gelsyn's ASP dropped 8% and Durolane's ASP dropped 11%. The following quarter, Gelsyn's ASP fell another 22% and Durolane's ASP fell another 20%. The changes Bioventus faced after the regulatory change was an anomaly compared to

23

other medical device companies. Out of 64 products added to CMS's Medicare Part B price list since January 1, 2021, the median change in reported ASP in the two quarters after a drug is added to the list is -0.1% and 0.0%, respectively. This demonstrated that Bioventus was far more reliant on the regulatory loophole than its competitors, and the Company was ill-prepared for the ASP reporting shift.

86.    As observed by analysts from J.P. Morgan in a March 8, 2021 report, Medicare accounted for 40% of the Company's HA injection revenues, whereas the commercial sector accounted for the other 60%. During the first quarter of 2021, Bioventus reported $41.53 million in revenue from its Pain Treatments vertical, which included the Company's HA injection products. Of that $41.53 million, Medicare accounted for $16.6 million in revenues. Assuming Durolane and Gelsyn comprised at least two thirds of the $16.6 million in Medicare revenue, then Medicare revenues from sales of those two products were roughly $11 million for the first quarter of 2021. As the shift to ASP pricing caused a roughly 20% decrease in the prices of Durolane and Gelsyn, the shift would result in a quarterly reduction of Medicare revenue in the millions.

87.    Intensifying the issue was the fact that non-Medicare/Medicaid patient pricing, set by private healthcare entities, often adjusted their pricing to correspond with changes in Medicare/Medicaid pricing. As a result, the Company would receive reduced revenue from both Medicare/ Medicaid and its commercial clients.

88.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that:

24

(i) Bioventus had materially deficient internal controls over financial reporting; (ii) the Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

### False and Misleading Statements Issued During the Relevant Period

89.     On January 19, 2021, Bioventus filed a registration statement with the SEC on Form S-1. After several amendments, the registration statement was declared effective by the SEC on February 10, 2021 (the "Registration Statement"). The Registration Statement was signed by Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker, Parker, and Sutter. On February 12, 2021, Bioventus filed a prospectus on Form 424B4 with the SEC, which was incorporated into the Registration Statement (the "Prospectus").

90.     The Registration Statement falsely stated that, pursuant to the Company's revenue recognition policy, Bioventus only reported revenues that were "net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, [and] contractual allowance."

91.     The Registration Statement continued, stating that "these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant

factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." Specifically regarding rebates, the Registration Statement claimed that the Company "reduce[s] revenue and record[s] the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."

92.     The Registration Statement indicated that the Company's revenue recognition procedures were in compliance with ASC 606, stating that "[t]he amount of variable consideration is included in the transaction price" and thus is only recorded as revenue "to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." In the Registration Statement, the Company further purported to "regularly review all reserves and update them at the end of each reporting period as needed."

93.     The Prospectus reiterated the Company's compliance with ASC 606, stating that Bioventus "report[s] sales net of contractual allowances, rebates, and returns." The Prospectus continued:

> **Revenue recognition**
>
> Sale of products
> . . . .
>
> We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

26

*Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products.* We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. Adjustments arising from the change in estimates of variable consideration were not significant for the years ended December 31, 2019 and 2018.[4]

94.     The Prospectus further stated:

**Discounts and rebates**

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

95.     On March 26, 2021, Bioventus filed its 2020 annual report for the year ending December 31, 2020 on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker, and Sutter. Attached to the 2020 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Reali and Anglum certifying, *inter alia*, that Reali and Anglum had disclosed "[a]ll significant deficiencies and material weaknesses in the

---

[4] All emphasis is added unless indicated otherwise.

Case 1:24-cv-00639-CCE-JEP    Document 1    Filed 07/31/24    Page 27 of 80

design or operation of internal control over financial reporting." With respect to revenue recognition, the 2020 10-K stated:

### Revenue Recognition

Sale of products

. . . .

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities. ***Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products.*** We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2020 and 2019.

96.     With respect to discounts and rebates, the 2020 10-K stated:

### Discounts and rebates

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

97.     The notes to the financial statements provided in the 2020 10-K stated:

*Discounts and gross-to-net deductions*

. . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

98.     The 2020 10-K indicated that the Company's internal controls had been evaluated and found to be effective:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020

*             *             *

During 2020 we remediated a material weakness associated with the proper processing of Exogen reimbursement claims in accordance with regulations and contractual terms.

99.     On May 13, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2021 (the "1Q2021 10-Q"). With respect to revenue recognition, the 1Q2021 10-Q stated that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K." Attached to the 1Q2021 10-Q were SOX certifications signed by Defendants Reali and Anglum certifying, *inter alia*, that Reali and Anglum had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over

29

financial reporting."

100.   The 1Q2021 10-Q reiterated that Defendants Reali and Anglum found the Company's internal controls to be effective, stating:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 3, 2021.

101.   On August 11, 2021, Bioventus filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2021 (the "2Q2021 10-Q"). The 2Q2021 10-Q repeated the statement contained in the 1Q2021 10-Q that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K." Attached to the 2Q2021 10-Q were SOX certifications signed by Defendants Reali and Anglum certifying, *inter alia*, that Reali and Anglum had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

102.   The 2Q 2021 Quarterly Report represented that Defendants Reali and Anglum found the Company's internal controls to be effective, stating:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure

controls and procedures were effective at the reasonable assurance level as of July 3, 2021.

103.    On November 10, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2021 (the "3Q2021 10-Q"). The 3Q2021 10-Q repeated the exact same statement that was contained in the 1Q2021 10-Q and the 2Q2021 10-Q that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K." Attached to the 3Q2021 10-Q were SOX certifications signed by Defendants Reali and Anglum certifying, *inter alia*, that Reali and Anglum had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

104.    In the 3Q2021 10-Q, the Defendants Reali and Anglum maintained that the Company's internal controls were effective, stating:

> ***Evaluation of Disclosure Controls and Procedures***
>
> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of October 2, 2021.

105.    On March 10, 2022, Bioventus filed a current report on Form 8-K with the SEC, announcing the Company's fourth quarter and fiscal year 2021 financial results. That filing reported $62.7 million in revenue for the Pain Treatments vertical, $130.4 million in total net sales, and $28.5 million in adjusted EBITDA for the fourth quarter of 2021.

106.    During an earnings call held the same day, in response to a question regarding Medicare "potentially cutting prices in the not-too-distant future" and how well Bioventus

31

was prepared for the transition relative to its competitors, Defendant Reali stated:

> Yes. Thanks for the question, Drew, on that. We've looked at this very carefully, and this is not a Medicare cut per se, but it's focused on ASP reporting and ASP reimbursement, average selling price reimbursement. One of the things that we've historically done at Bioventus in our HA business is focused on market access. And what that means is having specific contracts with insurance carriers such as United Healthcare, the largest private carrier in the country today. And with those contracts, gives us unfettered access to accounts and the ability to cross sell to what we call non-contracted, non-United patients. But we also spend a lot of money relative to getting those contracts through rebates back to insurance companies where we have that unfettered access in that exclusive contract. ***So when we look at this analysis for us, and this is specific to Bioventus, I can't speak for other countries or other companies, rather, it's a net-neutral for Bioventus.*** While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change.
>
> So for Bioventus, it provides us with basically a balanced footing on the HA reimbursement side. We may see some choppiness as we go through this, and we're projecting this would occur in the third quarter this year. But we feel that choppiness will be very short-lived as we work through the ASP reimbursement and, of course, the rebate change associated with that, that we pay back to insurance companies.

107.    On March 11, 2022, Bioventus filed its 2021 annual report on Form 10-K for the year ending December 31, 2021 with the SEC (the "2021 10-K"), which was signed by Defendants Reali, Anglum, Hawkins, Beyer, Cowdy, Ladone, McMurry-Heath, Neels, Nohra, Stalnecker, Sutter, and Vizirgianakis. Attached to the 2021 10-K were SOX certifications signed by Defendants Reali and Anglum certifying, *inter alia*, that Reali and Anglum had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." With respect to revenue recognition, the 2021 10-K stated:

Case 1:24-cv-00639-CCE-JEP     Document 1     Filed 07/31/24     Page 32 of 80

*Revenue recognition*

Sale of products

. . . .

We recognize revenue generally at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude taxes collected from customers and remitted to governmental authorities from revenues.

***Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements, and certain distribution and administration fees offered in customer contracts and other indirect customer contracts relating to the sale of products.*** We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experiences, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no significant adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2021 and 2020.

108.    The notes to the financial statements provided in the 2021 10-K stated:

***Discounts and gross-to-net deductions***

. . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

109.    The 2021 10-K again indicated that the Company's internal controls had been evaluated and found to be effective, stating:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021.

**Management's Report on Internal Control over Financial Reporting**

. . . .

In connection with the preparation and filing of this Annual Report, the Company's management, including our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Our assessment of, and conclusion on, the effectiveness of internal control over financial reporting did not include Misonix and Bioness, both acquired by the Company in 2021 and included in our 2021 consolidated financial statements. Misonix and Bioness are now wholly-owned subsidiaries of the Company and comprised approximately 51.2% and 6.4%, respectively, of total assets, and approximately 3.6% and 7.9%, respectively, of total net sales, of the Company's related consolidated financial statement amounts as of and for the year ended December 31, 2021. Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective.

110.    On April 29, 2022, Bioventus filed the 2022 Proxy Statement with the SEC to solicit shareholder approval for, *inter alia*, the election of Defendants McMurry-Heath, Neels, Nohra, and Vizirgianakis.

111.    With respect to the Board's risk oversight function, the 2022 Proxy Statement

34

stated:

> One of the key functions of our Board of Directors is informed oversight of our risk management process. Our Board of Directors has delegated to the Audit and Risk Committee oversight of the Company's enterprise risk assessment and management processes, including oversight of the Company's financial and cybersecurity risks. Management quarterly presents to the Audit and Risk Committee on cyber and information security. Our Nominating and Corporate Governance Committee monitors the effectiveness of our Corporate Governance Guidelines. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our Compliance, Ethics and Culture Committee is responsible for oversight of legal, compliance, and regulatory risks. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board of Directors is regularly informed through committee reports about such risks.

112.    On May 10, 2022, Bioventus filed a current report on Form 8-K with the SEC, announcing the Company's financial results for the first quarter of 2022. That filing reported $52.1 million in revenue for the Pain Treatments vertical, $117.3 million in total net sales, a net loss of $14.8 million, and $7.1 million in adjusted EBITDA.

113.    During the related earnings call held on May 10, 2022, Defendants Reali had the following exchange with an analyst:

Analyst:

[Y]ou touched on the potential pricing mechanism change here coming in the second half of the year. I think if you could maybe just provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business. And any quantification you might be willing to sort of characterize over the next 12 months or as you annualize the potential pricing change.

Defendant Reali:

Sure. So the way we look at this is we do expect the ASP reporting to happen. It's not 100%, but we think it's likely in the second half of the year. And that

35

impacts Medicare pricing specifically to ASP reporting. But on the other side of the equation is our contracted business where we pay rebates. Very specifically, with contracts like United and Cigna, we pay rebates. Within our contracts with these payers, we have very specific clauses to reduce the rebates based on ASP reporting.

So when we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. ***We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.***

114.    On May 11, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2022 (the "1Q2022 10-Q"). The 1Q2022 10-Q repeated the exact same statement that was contained in the Company's previous quarterly reports that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2021 Annual Report on Form 10-K." Attached to the 1Q2022 10-Q were SOX certifications signed by Defendants Reali and Singleton certifying, *inter alia*, that Reali and Singleton had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

115.    The 1Q2022 10-Q again stated that the Company's internal controls and procedures were found to be effective, stating:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 2, 2022.

36

116.     On August 11, 2022, Bioventus filed a current report on Form 8-K with the

SEC, announcing the Company's financial results for the second quarter of 2022. That

filing reported $63.9 million in revenue for the Pain Treatments vertical, $140.3 million in

total net sales, a net loss of $8.0 million, and $22.9 million in adjusted EBITDA.

117.     During the related earnings call held on August 11, 2022, Defendant Reali

stated:

> As we highlighted on previous earnings calls, reimbursement for HA shifted
> from wholesale acquisition cost to average selling price at the end of June.
> ***Given the sales mix of our HA portfolio, this new pricing dynamic has not
> fundamentally impacted our overall growth opportunity.*** As expected, we
> have been able to lower our reimbursement rebate rates on all of our preferred
> contracts with private payers, which has offset lower pricing for other areas
> of our HA business.
>
> The modifications to these agreements are consistent with our modeling
> exercises done over the past several months as we prepared for this new
> environment.

118.     Also during this earnings call, in response to a question regarding the impact

of the ASP pricing shift on the Company, Defendant Reali stated:

> Well, we did see, based on ASP reporting a dip in our pricing for
> DUROLANE and GELSYN, in particular, [Supartz] was already ASP
> reported. But as we've talked about that has been countered by our rebate
> adjustments that per our planning, and we're very pleased with the results of
> this and it's a credit to our market access team. We've been able to adjust all
> of our rebates on our contracted business, which is a significant portion to a
> lower amount that net effect, Alex, ***negates any impact*** on the ASPs because
> we're paying less rebates on our contracted business.
>
> ***So as we've modeled that over the past several months that turned out
> exactly the way we thought it would. So the first phase of this has gone
> well.***

119.     Later during this earnings call, in response to a question regarding the

Company's financial guidance for its HA sales, Defendant Reali stated:

> So what's built into our forecast going forward is continued volume growth in our HA business as we've seen before because we've seen no indication of impact on the volume and that's certainly something we'll take advantage of. ***And as I talked about in the prior question on HA, a lot of our ASP impact, all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business,*** which is a significant portion and that has been true to our model and it's something that we're excited about.

120. On August 12, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "2Q2022 10-Q"). The 2Q2022 10-Q repeated the statement that was contained in the Company's previous quarterly reports that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2021 Annual Report on Form 10-K." Attached to the 2Q2022 10-Q were SOX certifications signed by Defendants Reali and Singleton certifying, *inter alia*, that Reali and Singleton had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

121. The 2Q2022 10-Q indicated that the Company's internal controls had been evaluated and found to be effective, stating:

> ***Evaluation of Disclosure Controls and Procedures***
>
> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of July 2, 2022.

122. On September 14, 2022, at the Morgan Stanley Global Healthcare Conference, Defendant Singleton had the following exchange with an analyst:

38

Analyst:

[E]arlier in the year, there was the big debate about what Medicare changes in pricing regime will kind of [do] to the HA market. And I think if I kind of go back and look at your updated guidance, I mean, it sounds like you're kind of baking in some potential disruptions in the marketplace. But for 2 months, roughly 2 months after the change, I mean, are you seeing anything from an underlying utilization perspective that's giving you concern that there is going to be disruption in the HA market as a result of the change?

Defendant Singleton:

Yes, obviously I'm new to the HA market, but I will tell you, I really have a lot of confidence in the team that we have navigating us through that. And so far, for the first 2 months, it's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected.

123.    When the analyst probed further, asking if there was "any disruption [] that was kind of baked in there," Defendant Singleton stated:

Yes. I guess I guess what adjective you want to put on it disrupted or choppiness, ***Yes, we expect a little bit of choppiness in the back half as we make the transition from WAC to ASP, but it's kind of all built into our models.***

124.    Also during the conference, in response to a question regarding the importance of entering into exclusive contracts with more commercial insurers after the ASP pricing shift, Defendant Singleton stated:

I think we're going to – we feel really good. I mean, Cigna has just come on. I mean between Cigna and United that gives us really access to preferred lives and a lot of leverage in the market. We believe that's going to help us going through the WAC to ASP transition, ***we have adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world.***

125.    During an earnings call held on November 8, 2022, Defendant Reali stated:

While we expect to see continued pressure on GELSYN revenue through

39

the first half of 2023, we believe that the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and GELSYN pricing stabilizes to a more competitive position. As a reminder, ASP reporting is based on a 4-quarter look back. While both GELSYN and DUROLANE moved from WAC to ASP pricing, this dynamic did not impact DUROLANE, which maintained strong double-digit growth for the quarter.

126. Later during the earnings call, Defendant Reali had the following exchange with an analyst:

Analyst:

[A]s you're looking at these issues, and I get that some of these are transitory, what's giving you really the confidence on the visibility to maybe label some of these as transitory. And maybe specifically with the HA side, you talked about being like kind of mid next year until these kind of resolved. But again, kind of what gives you confidence –that level of confidence and that there's not broader implications for the other parts of the HA portfolio to come?

Defendant Reali:

So we model this out, and we have a full understanding of where our pricing is going to go over the next year with all 3 HA products, DUROLANE, GELSYN as well as SUPARTZ. So if you look at it that way, we have a really good understanding of that as well as the market dynamics.

127. The statements identified above in ¶¶ 89-126 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (ii) the Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and

40

profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

**THE TRUTH BEGINS TO EMERGE**

128. On November 8, 2022, Bioventus filed a current report on Form 8-K, revealing disappointing financial results for the third quarter of 2022. The Company reported $137 million in total revenue and $22.7 million in EBITDA, significantly below consensus estimates of $141.6 million and $25.3 million. Bioventus further reported $55.419 million in net sales for its Pain Treatments vertical. The Company attributed a 13% quarter-over-quarter decline in revenues from the Pain Treatments vertical to a slump in the demand for Gelsyn. In light of the poor results, Bioventus reduced its net sales guidance from its previous range of $547.5 million to $562.5 million to a range of $527 million to $532 million.

129. During the November 8, 2024 earnings call, Defendant Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN" and further attributable to "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting" and "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

130. Defendant Reali concealed the full extent of the Company's issues, however, insisting that the new pricing "dynamic did not impact Durolane," and that Bioventus had a "full understanding" of HA product pricing. Defendant Reali stated: "So we model this

41

out, and we have a full understanding of where our pricing is going to go over the next year.  We certainly know the competition. We know the markets and we know where the pricing is going to be."

131.    On this news, the price of Bioventus's stock plummeted 57.5% in one day, closing at $3.00 per share on November 8, 2022.

132.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

133.    On November 16, 2022, Bioventus filed a Notification of Late Filing on Form 12b-25 announcing that it would be unable to timely file its quarterly report on Form 10-Q for the third quarter of 2022 and disclosed that the Company may be required to take "an impairment charge in the range of $185 million to $205 million." The Company further disclosed that Bioventus was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain Treatments vertical," and that the "recognition of additional rebates may impact Bioventus's recently announced revenue guidance." The Company admitted that its "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1,

42

2022" and stated that it was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year."

134.    On this news, the price of Bioventus's stock dropped 33% in one day, closing at $1.97 on November 17, 2022.

135.    On November 21, 2022, Bioventus belatedly filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "3Q2022 10-Q"), that revealed that the rebate claim from United Healthcare during the third quarter of 2022 caused an $8.4 million reduction in revenue that had previously been reported for the third quarter of 2022 along with a $4.3 million reduction in adjusted EBITDA. This reversal contributed to Bioventus's 16% year-over-year revenue decline of $8.953 million in Pain Treatments vertical revenues from its United States operations. The Company attributed the decline in Pain Treatments revenues to "more treatments being sold under contracts with major issuers at *lower prices* and *price competition* within the osteoarthritic joint pain treatment market."

136.    The 3Q2022 10-Q further revealed a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles [GAAP]" "due to the recent decline in our market capitalization." This disclosure thereby admitted that Bioventus's overall business was suffering significantly due to the ASP pricing shift and the Company's internal control deficiencies.

137.    The 3Q2022 10-Q further admitted material weaknesses in internal control over financial reporting, stating:

The Company's management, including our Chief Executive Officer and

43

Chief Financial Officer, identified a material weakness related to the Company's internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected and corrected on a timely basis.

138.    The 3Q2022 10-Q detailed that Company's "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." Bioventus disclosed for the first time that, when it received the multi-million-dollar claim from United Healthcare, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual."

139.    The 3Q2022 10-Q further revealed that the $8.4 million reduction in revenue was "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" 3Q2022 10-Q. The Company explained that recent "conditions and events raise substantial doubt about the Company's ability to continue as a going concern."

140.    On this news, the price of Bioventus's common stock declined 3.7% in one day, closing at $1.81 per share on November 22, 2022.

141.    On January 11, 2023, at the JPMorgan Healthcare Conference, Defendant Reali had the following exchange with an analyst:

Analyst:

If we do start with the short term, there's been some disruption in the HA market. They switched how they measure pricing, and it's led to a market

44

decline, not just with you but also across your competitors. So maybe spend a minute there exactly what's happening? How much of an impact it's have on Bioventus and when it should resolve?

Defendant Reali stated:

First of all, with DUROLANE, we have seen sustained double-digit volume growth and that has counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price.

142. On March 31, 2023, the truth finally fully emerged when the Company issued a press release included as an attachment to a current report on Form 8-K disclosing its fourth quarter and fiscal year 2022 financial results. The press release quoted Defendant Reali as stating: "Our results reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical."

143. The press release further reported that "[t]otal net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims."

144. During an earnings call held on the same day, Defendant Reali stated that the Company's financial performance "fell below our expectations" because of "continued pressure across our HA franchise" and alleged "[u]nanticipated rebate claims from one private payer," "along with lower volume growth and decreased selling price across our HA business." Defendant Reali further revealed that the Company received "rebate claims of approximately $4 million" from United Healthcare, "which represent claims previously not billed to us. United Optum recently notified us that they had found these unbilled claims

45

in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us."

145.    Defendant Reali further admitted that, as a result of the rebate claims, Bioventus's "average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously expected," that the Company had "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter."

146.    Defendant Reali also revealed that, because the Company was struggling financially, Bioventus could no longer afford to make the payments necessary to complete the CartiHeal acquisition dating back to July 2022 and would therefore have to pay $10 million to CartiHeal's former owners to cancel the acquisition.

147.    Also on March 31, 2023, Bioventus filed its 2022 annual report for the year ending December 31, 2022 on Form 10-K (the "2022 10-K"), revealing a 3.1% decline in the Company's U.S. Pain Treatments net sales from $201.068 million in 2021 to $194.830 million in 2022. The Company attributed the decline to "more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume."

148.    The 2022 Form 10-K further stated that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments for the sale of these products."

149.    On this news, the price of Bioventus's stock declined 11.6%, closing at $1.07

46

per share on March 31, 2023.

150. 

151. On April 5, 2023, Bioventus announced that the Board had informed Defendant Reali on April 3, 2023 "that he would transition from his role as" as CEO of the Company. Defendant Reali resigned as an officer and director the next day, April 4, 2023.

152. Following the departure of Defendant Reali, Anthony P. Bihl III, the Company's former CEO from 2013 until 2020, joined the Company as interim CEO.

153. Since April 2023, the Company has sold off several of the businesses that it had acquired under Defendant Reali's leadership in order to raise needed cash and keep the Company afloat.

## DENIAL OF THE MOTION TO DISMISS THE SECURITIES CLASS ACTION

154. On November 6, 2023, Judge Catherine C. Eagles of the United States District Court for the Middle District of North Carolina denied the motion to dismiss the

47

Securities Class Action, sustaining claims under Sections 10(b) and 20(a) of the Exchange Act against defendants Reali, Singleton, Anglum, and Stalnecker. *See generally Ciarciello v. Bioventus Inc. et al.*, Case No. 1:23-cv-00032-CCE-JEP (M.D.N.C.)(Dkt. No. 75).

155.    In the Securities Class Action, the Court rejected defendants' arguments that: (1) defendants' statements were not false or misleading; (2) plaintiffs did not allege facts showing that defendants acted with the requisite scienter; and (3) the plaintiffs did not suffer a loss attributable to the statements. *Id*. at 4.

156.    To the contrary, the Court found that "plaintiffs set forth extensive facts to support the following: (1) Bioventus never designed or implemented a documented or consistent process for estimating rebates and changed the estimated inputs for rebate calculation without any data or legitimate reason; (2) the defendants knew that their rebate calculation methods were inadequate because of the large rebate request in 2021 and the audit report; (3) the defendants did not take serious steps to create a process for estimating rebates that went beyond guessing; and (4) the defendants continued to assert that they had adjusted net revenue projections based on a careful evaluation of data, including 'historical experiences' and 'known market events and trends' when they had not." *Id.* at 5 (internal citations omitted).

157.    Judge Eagles further found that the facts provided by plaintiffs' "allow the inference that the defendants' representations about revenue and the effect of the Medicare price change were false and misleading and that the defendants acted with the requisite degree of scienter."

48

## DAMAGES TO THE COMPANY

158.    As a direct and proximate result of the Individual Defendants' misconduct, Bioventus has expended and will continue to expend many millions of dollars.

159.    Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class action. Additionally, should the settlement in the Securities Class Action be approved, the payment of $15,250,000 million to resolve that action. If the settlement of the Securities Class Action is not approved, the Company will have exposure for potential payments to satisfy a judgment in the Securities Class Action.

160.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

161.    As a direct and proximate result of the Individual Defendants' conduct, Bioventus has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

162.    Because of their positions as officers and/or directors of Bioventus, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Bioventus and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage

49

the Company in a fair, just, honest, and equitable manner at all relevant times.

163. Therefore, the Individual Defendants were required to act in furtherance of the best interests of Bioventus and its shareholders.

164. Each director and officer of the Company owes to Bioventus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

165. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bioventus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

166. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Bioventus, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

167. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the

50

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding Bioventus's materially deficient internal controls and the adverse impacts that the shifting regulatory landscape would have on the Company's business, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

168.   To discharge their duties, the officers and directors of Bioventus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Bioventus were required to, among other things:

(a)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Bioventus's own Code of Compliance and Ethics;

(b)      Exercise good faith to ensure that the affairs of the Company were conducted in an ethical, business-like manner;

(c)      Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)      Remain informed as to how Bioventus conducted its operations, and,

51

upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Bioventus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Bioventus's operations would comply with all applicable laws and Bioventus's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

52

169. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bioventus.

170. At all times relevant hereto, the Individual Defendants were the agents of each other and of Bioventus and were at all times acting within the course and scope of such agency.

171. Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## THE CODE OF COMPLIANCE AND ETHICS

172. Bioventus's Code of Compliance and Ethics (the "Code of Ethics") begins with a commitment to "uphold the highest ethical standards when we do business."

173. The purpose of the Code of Ethics is to promote:

- Compliance with applicable governmental laws, rules and regulations
- Honest, transparent, and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, and in all interactions with patients, healthcare professionals, customers, colleagues, and third parties, including government employees.
- Full, fair, accurate, timely, and understandable disclosure in reports and documents that Bioventus files with, or submits to, the Securities and Exchange Commission and other government agencies, and in other public communications made by Bioventus.
- Protection of Company assets, including confidential information.
- Fair and ethical business practices.
- Personal accountability for adherence to this Code.
- The prompt internal reporting to Compliance of violations of this Code.

174. The Code of Ethics applies to "all directors, officers (including our principal

financial officers), and other employees, and those with whom we do business," and those found in violation of the Code of Ethics "will be subject to disciplinary action, up to and including termination (or, in the case of a director, a request that such director resign), and in appropriate cases, may be subject to civil action or referral for criminal prosecution."

175.  In a section titled "We Do Business the Right Way," the Code of Ethics states, in pertinent part:

> Bioventus balances its mission to innovate and significantly improve lives with a commitment to our regulatory obligations in the areas of research, development, and manufacturing. Bioventus is committed to conducting activities consistent with all applicable laws and regulations, as well as recognized international ethical guidelines such as Good Laboratory Practices (GLP), Good Manufacturing Practices (GMP) and our internal quality standards.

176.  In a section titled "We safeguard our assets and maintain our financial integrity," the Code of Ethics states, in pertinent part:

> Bioventus is committed to honestly and accurately recording and reporting all Company information, both financial and non-financial. You must maintain books and records that accurately reflect the true nature of transactions entered into or conducted by or on behalf of Bioventus. Your records must have enough detail to demonstrate that the transactions meet all applicable legal requirements and our system of internal controls. You must execute transactions in accordance with management's authorization and in conformity with accounting standards and other applicable criteria. For example, expense reimbursement requests must accurately reflect the true nature and amount of the expenses.

177.  In a subsection titled "Compliance with Regulation FD," the Code of Ethics states, in pertinent part:

> In connection with its public communications, Bioventus is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material nonpublic information about

54

Bioventus to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

## THE AUDIT AND RISK COMMITTEE CHARTER

178.    Bioventus's Audit and risk Committee Charter states that the purpose of the Audit Committee is to assist the Board in its oversight of the Company's:

> (i) accounting and financial reporting processes and the audits and reviews of the Company's annual and interim financial statements (ii) risk management practices and procedures (iii) compliance with legal and regulatory requirements with respect to financial statements, financial reporting, and internal controls (iv) independent registered public accountants' qualifications, performance, and independence (v) internal audit function (vi) financial reporting risk assessment and mitigation (vii) disclosure controls and procedures and internal controls over financial reporting, and (vii) preparation of the report of the Committee to be included in the Company's annual proxy statement in accordance with the rules and regulations of the Securities and Exchange Commission (the "SEC").

179.    With respect to the Company's quarterly reports, the Audit and Risk Committee Charter states:

> [T]he Audit Committee shall review and discuss with the Company's management and independent auditor the Company's annual audited financial statements and, prior to the Company's filing of each Form 10-Q with the SEC, the quarterly financial statements, including disclosures under the caption 'management's discussion and analysis of financial condition and results of operation' and the matters required to be discussed by applicable PCAOB standards and SEC rules.

180.    With respect to the Company's earnings press releases, the Audit and Risk Committee Charter states:

> [T]he Audit Committee will review the information to be disclosed in, and presentation of, the Company's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information),

55

discuss the earnings press releases and review any financial information and earnings guidance provided to analysts and rating agencies.

181. In a section titled "***Internal Controls and Disclosure Controls***," the Audit and Risk Committee tasks the Audit and Risk Committee with the following responsibilities:

- review and provide feedback as deemed appropriate on (i) the assessment performed by Company management on internal control over financial reporting for inclusion in the Company's Annual Report on Form 10-K with respect to quality, adequacy, and effectiveness of the Company's internal control structure and procedures for financial reporting; and (ii) the report and attestation of the independent registered public accountants regarding the Company's internal control over financial reporting;
- discuss with the independent registered public accountants, the internal auditor and management, on a quarterly basis, the Company's internal control over financial reporting and any fraud involving management or others with a significant role in the internal controls; review any major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of any significant deficiencies or material weaknesses; receive recommendations for the improvement of such control; and review whether any such previously approved recommendations have been implemented and any other significant changes in internal control over financial reporting have been made since the last evaluation;
- receive and review any disclosure from the Company's Chief Executive Officer or Chief Financial Officer made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data, and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control;
- review the disclosure controls and procedures of the Company designed to ensure timely collection and evaluation of information required to be disclosed in the Company's filings with the SEC or posted on the Company's website;
- advise the Company's Disclosure Committee, as necessary, on disclosure related matters and assist in resolving any significant disagreements among management to ensure the timely and accurate filing of Form 8-K on material developments affecting the Company;

56

and

- review the independent registered public accountants' procedures and management of the audit related to internal control over financial reporting.

182. In a section titled "*Internal Audit*," the Audit and Risk Committee Charter tasks the Audit and Risk Committee with the following responsibilities:

- approval of the appointment, compensation and removal of the Company's Director of Internal Audit and periodically review the qualifications, organizational structure and performance of the internal audit function and charter and give prior approval to any decision to appoint, replace, reassign, or dismiss the Company's chief audit executive. The Committee, through its Chair, shall also be required to concur in the total compensation being provided to the Director of the Internal Audit Department and sign off on his/her annual performance appraisal.
- review and approval of internal audit plans, including any recommended changes in the planned scope of such plans, and the internal audit department responsibilities, budget, staffing and overall adequacy of resources;
- review of significant reports to management prepared by the internal audit department, or summaries of such reports, and management's responses thereto;
- periodic review the independence and authority of the internal auditor's reporting obligations, the adequacy of internal audit resources, and the coordination and completeness of coverage between the internal auditors and independent registered public accountants;
- periodic review with the director of the Internal Audit department, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the Internal Audit Department's work;
- receive periodic summaries of findings from completed internal audits and, as appropriate, the status of major audits in process. Receive progress reports on the completion of the current year's internal audit plan, including explanations for any significant deviations from the plan;
- receive timely notification of any issues or concerns identified during the course of internal audits; and
- review and discuss with the independent registered public accountants, or other as appropriate, the responsibilities, budget, performance, and staffing of the Company's internal audit function.

57

183.    In a section titled "***Risk Oversight***," the Audit and Risk Committee Charter tasks the Audit and Risk Committee with the following responsibilities:

- review and discussion with management (i) the key guidelines and policies governing the Company's significant processes for risk assessment and risk management, (ii) the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, and (iii) other significant business risks of the Company that are not reported to another committee of the Board; and
- regularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Audit Committee deems appropriate.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

184.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

185.    Bioventus is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

186.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

187.    Plaintiff is an owner of Bioventus stock and has been a continuous holder of the Company's common shares at all relevant times.

188.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following eleven individuals: Defendants Stalnecker, Hawkins, Bartholdson, Beyer, Cowdy, McMurry-Heath, Ladone, Neels,

Nohra, and Sutter (the "Director Defendants"), as well as Non-Party Claypoole, the Company's current CEO. Plaintiff is required to show that six directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least ten of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

189. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

190. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a

59

suit even if they instituted it.

191.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

192.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

193.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

194.    Additional reasons that demand upon Defendant Stalnecker is futile follow. Defendant Stalnecker has served as a Company director since September 2020. The Company provides Defendant Stalnecker with significant compensation as detailed above. Defendant Stalnecker signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Stalnecker then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her

60

duties to protect corporate assets. Defendant Stalnecker is a defendant in the Securities Class Action and thus faces potential liability. For these reasons, Defendant Stalnecker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

195.   Additional reasons that demand upon Defendant Hawkins is futile follow. Defendant Hawkins has served as a Company director since September 2020. The Company provides Defendant Hawkins with significant compensation as detailed above. Defendant Hawkins signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Hawkins then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

196.   Additional reasons that demand upon Defendant Bartholdson is futile follow. Defendant Bartholdson has served as a Company director since January 2023. The Company provides Defendant Bartholdson with significant compensation as detailed above. As such, Defendant Bartholdson cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who

determine Defendant Bartholdson's compensation. Defendant Bartholdson therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Bartholdson is thus futile.

197.    Additional reasons that demand upon Defendant Beyer is futile follow. Defendant Beyer has served as a Company director since October 2021. The Company provides Defendant Beyer with significant compensation as detailed above. Defendant Beyer signed the 2021 10-K, which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Beyer then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Beyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand upon Defendant Cowdy is futile follow. Defendant Cowdy has served as a Company director since September 2020. Defendant Cowdy signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Cowdy then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company

director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cowdy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

199. Additional reasons that demand upon Defendant McMurry-Heath is futile follow. Defendant McMurry-Heath has served as a Company director since January 2022. The Company provides Defendant McMurry-Heath with significant compensation as detailed above. Defendant McMurry-Heath signed the 2021 10-K, which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant McMurry-Heath then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant McMurry-Heath breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

200. Additional reasons that demand upon Defendant Ladone is futile follow. Defendant Ladone has served as a Company director since July 2021. The Company provides Defendant Ladone with significant compensation as detailed above. Defendant Ladone signed the 2021 10-K, which contained false and misleading statements. Crucially,

63

the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Ladone then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Ladone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand upon Defendant Neels is futile follow. Defendant Neels has served as a Company director since September 2020. The Company provides Defendant Neels with significant compensation as detailed above. Defendant Neels signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Neels then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Neels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand upon Defendant Nohra is futile follow.

64

Defendant Nohra has served as a Company director since September 2020. The Company provides Defendant Nohra with significant compensation as detailed above. Defendant Nohra signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Nohra then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Nohra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

203. Additional reasons that demand upon Defendant Sutter is futile follow. Defendant Sutter has served as a Company director since September 2020. The Company provides Defendant Sutter with significant compensation as detailed above. Defendant Sutter signed the Registration Statement, the 2020 10-K and the 2021 10-K, all of which contained false and misleading statements. Crucially, the 2021 10-K was signed after the Board was presented with the Red Report, which informed the Board that the Company's internal controls were not effective. Defendant Sutter then solicited the 2022 Proxy Statement, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate

65

assets. For these reasons, Defendant Sutter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on Non-Party Claypoole is futile follow. Claypoole is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Bioventus, rendering him not independent. As such, Claypoole cannot independently consider any demand to sue himself for breaching his fiduciary duties to Bioventus, because that would expose him to liability and threaten his livelihood. As such, Claypoole could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Claypoole is therefore futile.

205.    Additional reasons that demand upon the Board is futile follow.

206.    Defendants Beyer, Ladone, and Stalnecker either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit and Risk Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Beyer, Ladone, and Stalnecker cannot independently

66

consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

207. Defendants Neels, Hawkins, and Sutter have a longstanding business relationship that precludes them from independently considering any demand to sue each other. In 1985, Defendant Sutter founded EW Healthcare, a healthcare growth equity and venture capital firm that, as of April 15, 2024, holds 16.4% of the Company's total voting power. Defendant Sutter is currently a Managing Director of EW Healthcare. Meanwhile, Defendant Hawkins serves as a Senior Advisor to EW Healthcare and Defendant Neels has been EW Healthcare's Operating Partner since 2013. As such, Defendant Neels receives his primary compensation from EW Healthcare, rendering both he and Defendants Sutter and Hawkins unable to disinterestedly and independently consider commencing litigation against themselves and the other Director Defendants.

208. Defendant Cowdy also has a business relationship that likewise precludes him from independently considering a demand. Defendant Cowdy has served as the Chief Business Development and Corporate Affairs Officer for Smith & Nephew plc, a medical equipment manufacturing company, since 2018 and has worked at Smith & Nephew plc since 2008. As of April 15, 2024, Smith & Nephew plc holds 27.7% of the Company's total voting power. As taking action against Bioventus would potentially harm Smith & Nephew plc, Defendant Cowdy is unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants.

209. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their

67

control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Bioventus stock and stock options they held.

210. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Bioventus's standards of business conduct. The Individual Defendants violated the Code of Ethics because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

211. Furthermore, demand in this case is excused because each of the Director Defendants derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Director Defendants' conduct. Significantly, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

212. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can

68

claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

213. The acts complained of herein constitute violations of fiduciary duties owed by Bioventus's officers and directors, and these acts are incapable of ratification.

214. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Bioventus. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Bioventus, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

215. If there is no liability insurance, then the Director Defendants will not cause Bioventus to sue the Individual Defendants named herein, since, if they did, they would face

69

a large uninsured individual liability. Accordingly, demand is futile in that event as well.

216.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

217.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

218.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

219.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants

70

collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

220.    Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

221.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Bioventus and was at all times acting within the course and scope of such agency.

## COUNT ONE
### Against Individual Defendants for Violations of
### § 14(a) of the Exchange Act

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit

the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (i) the Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

225. Moreover, the 2022 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Ethics was not complied with.

226. The Individual Defendants knew or recklessly disregarded that by

72

misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

227. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

228. Plaintiff on behalf of Bioventus has no adequate remedy at law.

## COUNT TWO

### Against Defendants Reali, Singleton, Anglum, and Stalnecker for Contribution Under § 21D of the Exchange Act

229. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

230. The conduct of Defendants Reali, Singleton, Anglum, and Stalnecker as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

231. Bioventus and Defendants Reali, Singleton, Anglum, and Stalnecker are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Bioventus is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

232. If Bioventus is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless

73

acts or omissions of Defendants Reali, Singleton, Anglum, and Stalnecker as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Bioventus is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

233. As officers and directors, Defendants Reali, Singleton, Anglum, and Stalnecker had the power or ability to, and did, control or influence, either directly or indirectly, Bioventus's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

234. The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

235. Defendants Reali, Singleton, Anglum, and Stalnecker have damaged the Company and are liable to the Company for contribution.

236. As such, Bioventus is entitled to receive all appropriate contribution or indemnification from Defendants Reali, Singleton, Anglum, and Stalnecker.

## COUNT THREE

### Against the Individual Defendants for
### Breach of Fiduciary Duties

237. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74

238. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

239. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

240. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

241. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital,

and reputational harm.

242. Plaintiff, on behalf of Bioventus, has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

243. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

244. By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

245. Plaintiff, on behalf of Bioventus, has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Unjust Enrichment

246. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bioventus.

248. The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Bioventus that was tied to their performance

76

or to the artificially inflated valuation of Bioventus.

249.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

250.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

251.    Plaintiff, on behalf of Bioventus, has no adequate remedy at law.

**COUNT SIX**

**Against the Individual Defendants for Waste of Corporate Assets**

252.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

253.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Bioventus's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

254.    The Individual Defendants caused Bioventus to waste corporate assets in acquiring companies that it no longer owns. For instance, Bioventus had to pay $10 million to CartiHeal's former owners to cancel the acquisition.

255.    As a result of the misconduct described above, the Individual Defendants

77

wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

256. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

257. Plaintiff on behalf Bioventus has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

78

Dated: July 31, 2024                    **HAUSLER LAW FIRM, PLLC**


                                        */s/ Kurt F. Hausler*
                                        Kurt F. Hausler
                                        NC Bar No.: 22103
                                        524 East Boulevard
                                        Charlotte, NC 28203
                                        Telephone: (704) 247-3255
                                        Email: khausler@hauslerlaw.com

                                        **THE ROSEN LAW FIRM**
                                        Phillip Kim
                                        Erica L. Stone
                                        275 Madison Avenue, 40th Floor
                                        New York, NY 10016
                                        Telephone: (212) 686-1060
                                        Email: philkim@rosenlegal.com
                                        Email: estone@rosenlegal.com

                                        *Counsel for Plaintiff*

Docusign Envelope ID: AF73BFC8-2F32-4FC8-96EC-99F2207B458F

## **VERIFICATION**

I, Jeffrey Vince, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/29/2024

Jeffrey Vince